# UNITED STATES DISTRICT COURT
## for the
Middle District of North Carolina



| | | |
|---|---|---|
| United States of America<br>v. | )<br>)<br>) | Case No. |
| | )<br>) | 1:12MJ *159-1* |
| James O'Brian Lackard | )<br>) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___October 2010 - August 2012___ in the county of ___Forsyth___ in the

___Middle___ District of ___North Carolina___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 846 & 841(a)(1) | Conspiracy to distribute 1 kilogram or more of heroin, a Schedule I controlled substance, within the meaning of 21 U.S.C. Section 812 |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jason T. Collins, DEA-TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___08/08/2012___

_____
*Judge's signature*

City and state: ___Winston-Salem, North Carolina___

Joi Elizabeth Peake
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Jason T. Collins, a law enforcement officer with the Winston-Salem Police Department and a Task Force Officer with the Drug Enforcement Administration, being duly sworn, hereby depose and state the following:

## INTRODUCTION

1. I am a Task Force Officer for the United States Drug Enforcement Administration (DEA), Department of Justice, Greensboro, North Carolina and as such I am empowered under Title 21, United States Code, Section 878, to enforce Title 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I am currently assigned to the DEA Greensboro Resident Office, Enforcement Group in Greensboro, North Carolina. I have served as a Task Force Officer for the Drug Enforcement Administration for approximately four and a half years. I have been employed as a Law Enforcement Officer for the Winston-Salem (NC) Police Department for approximately sixteen (16) years. My current assignment at the Winston-Salem Police Department is in the Vice/Narcotics unit where I have served as a detective for approximately ten (10) years. During my years in law enforcement, I have become familiar with the ways by which narcotics traffickers smuggle/sell narcotics and launder the proceeds.

2. In connection with my official duties, I investigate criminal and civil violations of the Controlled Substances Act. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. In connection with my duties and responsibilities as a law enforcement officer, I have

1

testified in judicial proceedings for violations of laws concerning controlled substances. I have participated in numerous drug trafficking investigations, including investigations that have resulted in felony arrests for violations of Title 21 of the United States Code. I have been involved in various types of electronic surveillance, in the execution of search and arrest warrants, and in the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealing of proceeds from controlled substance trafficking. I have both conducted and assisted in the investigation of numerous narcotics related investigations that resulted in the seizure of narcotics and related assets. Through training and experience, I am familiar with the methods and trends of trafficking in illicit drugs, as well as methods used by narcotic traffickers to conceal the proceeds of their unlawful activities from law enforcement.

3. This affidavit is based upon information obtained from my personal involvement in this investigation as well as information provided to me by other Special Agents and Task Force Office of the DEA, The Internal Revenue Service-Criminal Investigation (IRS-CI) and other state and local law enforcement officers. Since this affidavit is being submitted for a limited purpose, I am not including all the facts and information which I have learned about or obtained during the course of this investigation.

4. The subject of this investigation is engaged in continuing criminal activities, namely offenses involving the importation of controlled substances, in violation of Title 21, United States Code, Section 952; distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code,

2

Section 841(a)(1); laundering the proceeds of the sales of a controlled substance, in violation of Title 18, United States Code, Sections 1956(a) and 1957(a); the use of communications facilities in commission of narcotics offenses, in violation of Title 21, United States Code, Section 843(b); and attempt and conspiracy to commit the aforementioned crimes, in violation of Title 21, United States Code, Section 846 and 963. This investigation was initiated in 2010, and has been ongoing to present. The investigation has thus far included extensive use of physical and electronic surveillance, search warrant services, controlled purchases, and interviews. Among the goals of this investigation was to identify all members of the organization, the sources of supply, transportation methods, locations used to conceal drugs and the assets purchased from the proceeds derived from the sale of drugs and identification of all members of the targeted organization.

5. On or about May of 1998, the Greensboro Police Department worked on a drug-related investigation involving a suspect named "J". The investigation resulted in the identification of "J" as James O'Brian LACKARD. Investigators conducted a search of a residence occupied by LACKARD and seized over three kilograms of powder cocaine and multiple firearms; LACKARD was charged federally, subsequently convicted and sentenced to 52 months in federal prison. A co-defendant in LACKARD's criminal case cooperated with investigators. The co-defendant told investigators he/she had purchased a vehicle with an after-market, hidden compartment installed into the vehicle. The co-defendant also told investigators he/she had purchased the vehicle from LACKARD. That vehicle was seized by the Greensboro Police Department as part of its drug investigation on or about May 1998. It is common for those involved in the illegal

3

drug trade to equip vehicles with after-market, hidden compartments in order to conceal illegal drugs and/or U.S. currency.

6. In October of 2010, the North Carolina State Bureau of Investigation (NC SBI) was notified by a member of the Lexington Police Department about an interdiction traffic stop in Arizona that involved an individual from the Winston-Salem area. Upon further investigation, the NC SBI learned, on or about October 14, 2010 Arizona Department of Public Safety Officer D. Burns conducted a traffic stop on a 2003 grey Dodge pickup truck bearing VIN: 3D7MU48653G724911, registered to Unique Auto Detail of 1959 N. Peace Haven Road, Suite 109, Winston-Salem, NC 27106. At the time of the traffic stop, the truck was towing a 2001 red Ford Taurus four door bearing VIN: 1FAFP55U81A124811, registered to Jonathan EASTWOOD of 50 Avondale Street, Winston-Salem, NC 27127. The driver of the truck was the sole occupant of the vehicle(s) and was the registered owner of the Ford Taurus, Jonathan Meyer EASTWOOD. During the traffic stop, Officer Burns obtained consent to search both vehicles. A K-9 was also utilized; the K-9 indicated in a positive manner for the presence of the odor of narcotics on the Ford Taurus. A subsequent search of the Ford Taurus revealed approximately eleven pounds of heroin. EASTWOOD was arrested on drug related charges.

7. Following the traffic stop, heroin seizure and arrest of EASTWOOD, Arizona DPS officers applied for and were granted a search warrant for electronic and/or digital date, text messages and call related information from the following: one grey LG Verizon cellular telephone model VX5500PP with serial number 909CYLH0237072; one red and green Motorola i465 cellular telephone model number H98XAH6JR7AN with

4

serial number 364VKMNXTN; one black and silver Motorola i335 Boost mobile cellular telephone model number H98XAH6JR5AN with serial number 364VJL1QGG; one blue Samsung Verizon telephone model number SCH-U350 with SKU number SCHU350MPC; one GPS located device; and, one Garmin GPS navigation device, all of which were seized from EASTWOOD subsequent to his traffic stop and arrest.

8. The search of the GPS device(s) and statements made by EASTWOOD revealed EASTWOOD was operating his boss's truck, and EASTWOOD had traveled from North Carolina, to the Los Angeles, California area. EASTWOOD had met an unknown Mexican male named "Paco" at a bar in Riverside, California. The Mexican male offered EASTWOOD money to transport illegal drugs from California to North Carolina. Eastwood gave the Mexican male his Ford Taurus which was returned to EASTWOOD three days later. EASTWOOD told investigators he knew there were illegal drugs in the Ford Taurus, but he did not know exactly where the illegal drugs were hidden. No specific delivery information was obtained by investigators.

9. An analysis of the "Contacts" list from EASTWOOD's Motorola i465 cellular telephone revealed the following: "Jay" 718-682-5370 and 176*893*4726; "TY" 173*875*13606; "TY" at 151*139*5684; and "Bro" 801-716-0730 and 100*404*19. The Motorola i335 contained the following "Contacts": "Cj" 718-682-5370 and 176*351*180; and "Jmagtdwt" 646-302-2248 and 173*351*180. The cellular telephone number for "Jay" and "Cj are the same: 718-682-5370. It is common for those involved in the illegal drug trade to carry multiple cellular telephones, and it is also common for those involved in the illegal drug trade to use encrypted methods of storing cellular telephone numbers and/or when talking/testing regarding illegal drug transactions. *(The*

5

*cellular telephones used by all involved parties at that time are no long in service.)*

10. An analysis of text message sent from EASTWOOD's cellular telephone(s) indicated, at the time of the traffic stop which led to his arrest on October 14, 2010, at 1:44 pm, EASTWOOD sent a text from 336-515-6423 (EASTWOOD) to 801-716-0730 (Bro) which read, "Call Jay I might be going to jail in AZ". A subsequent text from the same number, to the same number on October 14, 2010 at 1:52 pm read, "yup" they got the dog". A review of the Arizona DPS reports revealed the traffic stop on EASTWOOD was initiated around 12:35 pm on October 14, 2010, the K-9 arrived on scene at around 2:10 pm, and EASTWOOD was arrested at around 3:00 pm. "Bro" is believed to be EASTWOOD's brother, Christopher EASTWOOD; "Jay" is believed to be James O'Brian LACKARD, as is "Cj" and "Jmagtdwt"; and "Ty" is believed to be Tyrone ROSEBOROUGH, as is "TY". (Henceforth, the typed name "EASTWOOD" refers to Jonathan EASTWOOD, all references to Christopher EASTWOOD will include this first name.)

11. Following his arrest on October, 14, 2010, Jonathan EASTWOOD was confined to the Yavapai County Jail, in Yavapai County, Arizona. The Arizona Department of Public Safety obtained recorded conversations of EASTWOOD and an third party maintained by the Yavapai County Jail as a matter of routine jail procedure. In many recorded conversations, EASTWOOD is told by his mother and brother in North Carolina "he" will take care of Jonathan EASTWOOD by putting money into his account at the county jail in Arizona. The recorded conversations include many statements about "him" taking care of EASTWOOD financially. Investigators believe "he" is James O'Brian LACKARD.

6

12. The vehicle EASTWOOD was operating at the time of his arrest was a 2003 grey Dodge pickup truck bearing VIN: 3D7MU48653G724911, registered to Unique Auto Detail of 1959 N. Peace Haven Road, Suite 109, Winston-Salem, NC 27106. A search of the AT&T subscriber information obtained for telephone number 336-922-3777 revealed the "FINANCIALLY LIABLE PARTY" to be Unique Mobile Detailing of 1959 Peace Haven Road, Winston-Salem, NC since "07/28/2004"; the "BILLING PARTY" to be the same name at the same address and the "USER INFORMATION" to be "JAY LACKARD" at the same address. Physical surveillance conducted by members of the Winston-Salem Police Department between the dates of October 2010 through October 2011 observed LACKARD at 1950 Peace Haven Road, Winston-Salem, NC on multiple occasions weekly. LACKARD petitioned the Arizona Department of Public Safety to have his vehicle returned to him. In an effort to further this investigation, the vehicle was returned to LACKARD.

13. Additional information obtained by way of physical and electronic surveillance of the business located at 1950 Peace Haven Road, Winston-Salem, NC revealed the following associates of LACKARD: Christopher EASTWOOD, Tyrone ROSEBOROUGH, Shawn DUNOVANT, Benjamin LEINBACK, and Courtney WILLIAMS. *(Associates are described as friends, employees or coworkers of LACKARD.)* Surveillance of the business revealed no legitimate car detailing business was conducted during the one-year long, weekly surveillance operations. Surveillance also determined LACKARD and/or his wife Jennifer LACKARD own and/or operate the following residences in and around Winston-Salem, NC: (1) 3791 Coral Garden Lane, Winston-Salem; (2) 2521 Polo Road, Winston-Salem; (3) 3716 Wabash Boulevard,

7

Case 1:12-mj-00159-JEP    Document 1    Filed 08/08/12    Page 8 of 12

Winston-Salem; (4) 502 Fifteenth Street, Winston-Salem; (5) 5065 Butterfield, Winston-Salem; (6) 287 Mystic Lane, Midway, NC; (7) 2210-B Clemmonsville Road, Winston-Salem; (8) 3640-B Westgate Center Drive, Winston-Salem; and (9) 1959 Peace Haven Road Suite 109, Winston-Salem. *(Henceforth, the typed name "LACKARD" will refer to James O'Brian LACKARD, references to Jennifer LACKARD will include her first name.)* Members of the Winston-Salem Department's Patrol Division have responded to suspicious persons calls at two or more of these residential locations in the past calendar year. Upon arrival, officers had encountered LACKARD as the owner of the property(s). During said encounters, LACKARD told patrol officer(s) the residence(s) were not occupied and that he used them for storage. *(It is common for those involved in the illegal drug trade to use vacant residential structure(s) as "stash houses" to store illegal drugs and/or US currency.)* Physical and electronic surveillance have revealed LACKARD's primary residence is the residence located at 3791 Coral Garden Lane.

14. Investigators have received information from three Confidential Sources of Information (hereafter CSI, CS2 and CS3 respectively) regarding the drug trafficking operation involving James O'Brian LACKARD and other individuals involved with this organization. The undersigned and other officers have debriefed the CSs on numerous occasions, and information provided by these individuals has proven to be accurate and reliable. *(The gender of the CSs in this matter will not be specified to assist in protecting the identities of these individuals.)*

15. During the aforementioned debriefing sessions, CS1 has advised investigators that he/she knows individuals who supply heroin. CS1 informed investigators that he/she knows an individual named "Jay" who supplies large quantities

8

of heroin to individual(s) in the Raleigh, North Carolina area. The subject known as "Jay" to CS1 has been identified as James O'Brian LACKARD.

According to CS1, he/she was first introduced to LACKARD sometime around November of 2007. CS1 stated that he/she was involved in narcotics at that time. CS1 further related that the relationship between the CS and LACKARD was only as friends. CS1 was present during some hand to hand deliveries between LACKARD and a third party, and CS1 had conversations or was present during conversations between LACKARD and a third party when LACKARD's sources of supply were discussed. Based on those conversations, CS1 determined LACKARD had at least two sources of supply, one of which was in the New York area.

16. During two other debriefing sessions, CS2 stated that he/she knew a heroin source of supply named "J". CS2 stated that in the latter half of 2008, CS2 began to obtain heroin from "J". CS2 later identified "J" as James O'Brian LACKARD. Between 2008 and May 2011 CS2 purchased approximately six kilograms of heroin from LACKARD. As a matter of routine business, CS2 would call LACKARD at 347-230-3797 or 173*163*86. The two would set the amount and price, and LACKARD would either deliver the heroin to him/her or LACKARD would send a courier to deliver the heroin. If LACKARD sent the heroin by courier, it was an individual named "Black". CS2 would then receive a cellular telephone call from "Black" from 347-273-3027 or 173*167*12374. While "Black" was en route, "Black" would call CS2 and advise CS2 of his location and estimated time of arrival. CS2 told investigators LACKARD would often times send "Black" to pick up the U.S. currency one week following the delivery of heroin, thus giving CS2 time to sell the heroin to pay LACKARD. CS2 also told

9

investigators "Black" delivered the heroin in one of two vehicles: a black Chevrolet Suburban or a white Honda station wagon. CS2 was shown a series of photos of who investigators believe to be associates of LACKARD. CS2 viewed the photos and identified Tyrone ROSEBOROUGH as LACKARD's courier nicknamed "Black".

17. During this investigation, CS3 provided investigators with some insight regarding the inner-workings of the LACKARD drug trafficking organization. Between May of 2012 and the date of this application, CS3 conducted a series of recorded conversations between him/herself and James LACKARD. These conversations took place in person and via cellular telephone. In May 2012, CS3 met with James LACKARD and conducted a series of cellular telephone calls to coordinate multiple wire transfers of U.S. currency from the Winston-Salem area to Vera Cruz, Mexico, for James LACKARD. The wire transfers were for payment regarding a shipment of heroin from Mexico to the James LACKARD DTO. In July 2012 a series of recorded meetings and cellular telephone calls between CS3 and LACKARD detailed LACKARD's desire to obtain multiple kilogram quantities of heroin, wherein LACKARD requested to pay CS3 or CS3's source of supply of heroin between $40,000.00 and $55,000.00 U.S. currency per kilogram of heroin. Also during July 2012, LACKARD told CS3 he could install after-market, hidden compartments in vehicles that were capable of driving cross-country. During August 2012, LACKARD described to CS3 a concealment method for transporting illegal drugs and/or bulk US currency inside after-market, hidden compartments inside automobiles.

18. Between June 2012 and the date of this application, CS3 has been at the business located at 2783 Nieman Industrial Drive, Winston-Salem, North Carolina to

10

meet with James LACKARD.  During multiple meetings at this location, LACKARD has shown CS3 components or parts associated with the installation of after-market, hidden compartments for motor vehicles and for furniture.  LACKARD explained to CS3 the significance of installing after-market, hidden compartments inside the airbag area of motor vehicles.  Physical surveillance determined LACKARD rents the garage/shop located at 2783 Nieman Industrial Drive, Winston-Salem, NC; the company sign "Unlimited Customs LLC" is posted out front of the business; according to the North Carolina Secretary of State, James LACKARD is the owner of Unlimited Customs LLC; and, the company website lists 2783 Nieman Industrial Drive as the address of the company Unlimited Customs LLC.

Jason T. Collins
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed before me this the ___8th___ day of August, 2012.

Joi Elizabeth Peake
United States Magistrate Judge
Middle District of North Carolina

11

Case 1:12-mj-00159-JEP    Document 1    Filed 08/08/12    Page 12 of 12